# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| IN RE FOX CORPORATION DERIVATIVE LITIGATION | CONSOLIDATED<br>C.A. No. 2023-0418-JTL |

## MEMORANDUM OPINION DENYING
## THE DEFENDANTS' MOTION TO DISMISS

Date Submitted: November 22, 2024
Date Decided: December 27, 2024

Joel Friedlander, Jeffrey M. Gorris, Christopher M. Foulds, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; Julie Goldsmith Reiser, Molly J. Bowen, Brendan Schneiderman, COHEN MILSTEIN SELLERS & TOLL PLLC, Washington, D.C.; Richard M. Heimann, Katherine Lubin Benson, LIEFF CABRASER HEIMANN & BERNSTEIN, LLP, San Francisco, California; Nicholas Diamand, Gabriel A. Panek, LIEFF CABRASER HEIMANN & BERNSTEIN, LLP, New York, New York; *Attorneys for Co-Lead Plaintiffs.*

Ellen Rosenblum, Brian A. de Haan, OREGON DEPARTMENT OF JUSTICE, Portland, Oregon; *Attorneys for Plaintiff State of Oregon.*

Blake Rohrbacher, Kevin M. Gallagher, Kyle H. Lachmund, Elizabeth J. Freud, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; William Savitt, Anitha Reddy, Cynthia Fernandez Lumermann, Won S. Shin, WACHTELL LIPTON ROSEN & KATZ, New York, New York; *Attorneys for Defendants K. Rupert Murdoch, Lachlan K Murdoch, Suzanne Scott, Viet Dinh, Charles D. Carey, Paul D. Ryan, Jacques A. Nasser, Anne Dias, Roland A. Hernandez, and Nominal Defendant Fox Corporation.*

**LASTER, V.C.**

This pleading-stage decision addresses whether the stockholder plaintiffs have standing to pursue a derivative action. When making that determination, the court must accept the complaint's well-pled allegations as true and grant the plaintiffs the benefit of all reasonable inferences. The complaint casts the defendants in a poor light, but at this stage of the case, the court cannot assess the truth of the allegations. The question instead is whether, taking those allegations as true, the plaintiffs have standing to assert their claims.

The plaintiffs have sued over events surrounding the 2020 presidential election. Late on November 3, 2020, the Fox News Channel declared Joseph Biden the winner of Arizona's electoral votes. Then-President Donald Trump contested the call based on allegations about election fraud. Hours later, Trump declared himself the winner. Despite Trump's claim, Fox News called the election for Biden on November 7. The daytime and primetime audiences for Fox News plummeted by over one-third.

Starting the next day, Fox News began airing stories sympathetic to Trump's election-fraud claims. Fox News also hosted guests who championed those claims. Trump advisors Sidney Powell and Rudy Giuliani appeared repeatedly on Fox News and asserted that Dominion Voting Systems and Smartmatic USA provided voting machines and voting software that illegally switched votes from Trump to Biden.

Dominion and Smartmatic sent cease-and-desist letters to Fox News' parent corporation, Fox Corporation ("Fox" or the "Company"). In the "Brainroom"—the Fox News fact-checking department—no one could find evidence to support the

accusations against Dominion or Smartmatic. Yet Fox News continued to air the election-fraud narrative and host guests who advanced it.

In February 2021, Smartmatic sued Fox for defamation. Dominion sued Fox in March. The Dominion trial moved forward more quickly. On the first day of the trial, Fox settled with Dominion for $787.5 million. The Smartmatic litigation remains pending.

Corporations don't have minds or bodies. They only act when humans cause them to act. But like humans, corporations can act in ways that harm themselves. Delaware law gives its corporations expansive freedom to pursue any lawful business in pursuit of profit. But Delaware law does not permit a corporation to operate unlawfully. Not only that, but corporate fiduciaries breach their duty of loyalty when they decide to violate the law. Thus, when humans cause a corporation to violate the law in a way that harms the corporation, the corporation can recover from the humans who knowingly caused the corporation to violate the law and suffer harm.

In this lawsuit, Fox stockholders seek to shift the Company's losses onto the individuals who they say caused the Company to violate the law and suffer harm. The plaintiffs contend that Fox's senior officers—including Rupert and Lachlan Murdoch[1]—and its board of directors (the "Board") decided to violate the law by having Fox News defame Dominion and Smartmatic. The plaintiffs allege that the

---

[1] I normally identify individuals by their last names without honorifics. In this case, two of the defendants have the same last name. Going forward, this decision refers to Rupert Murdoch as "Murdoch" and his son, Lachlan Murdoch, as "Lachlan." The latter usage neither implies familiarity nor intends disrespect.

2

defendants knew that Fox News was breaking the law by defaming Dominion and Smartmatic but consciously prioritized profits over legal compliance.

The defendants have moved to dismiss the complaint under Court of Chancery Rule 23.1. In substance, the motion asserts that even if the plaintiffs have identified valid corporate claims, they do not have standing to bring them. A corporate claim is a corporate asset, and under Delaware law, the board of directors has authority over how to manage the company. That includes making decisions about whether to assert corporate claims. But there is an exception to that rule. A stockholder plaintiff can pursue litigation on the corporation's behalf when its board of directors is so conflicted that the board cannot make an independent and disinterested decision about whether to sue. When a stockholder plaintiff seeks to invoke this exception, Rule 23.1 requires that the complaint plead facts sufficient to support it.

To analyze a Rule 23.1 motion, the court examines the board of directors in office when the suit was filed. Considering each director in turn, the court asks whether the complaint contains particularized allegations sufficient to raise a reasonable doubt about whether that director could make a disinterested and independent decision about whether to assert the claim. If that director-by-director analysis results in the board lacking a majority of independent and disinterested directors who could decide whether to sue, then the plaintiff has standing.

Here, the Board has eight members. For the Board to be able to exercise disinterested and independent judgment about whether to assert a claim, there must be at least five directors who qualify as disinterested and independent. Stated

conversely, the plaintiff must raise a reasonable doubt about the disinterestedness or independence of at least four directors.

The complaint alleges particularized facts sufficient to support a reasonable inference that Murdoch faces a substantial risk of liability for breaching his duty of loyalty by deciding in bad faith to have the Company violate the law. When a director faces a substantial risk of liability on a claim, that director has an interest in the corporation not asserting that claim. Murdoch is therefore disqualified for purposes of Rule 23.1.

The court need not analyze whether other members of the Board face a substantial risk of liability, because the complaint alleges facts sufficient to raise a reasonable doubt that at least three other directors lack independence from Murdoch. A reasonable doubt exists about whether Lachlan could make an independent decision about whether to sue his father. A reasonable doubt also exists about two other directors—Chase Carey and Jacques Nasser. The complaint alleges particularized facts about close and longstanding business and personal ties between them and Murdoch that are sufficient to disqualify them.

The plaintiffs have advanced other arguments, but this decision does not reach them. One basis for demand futility is sufficient. The Rule 23.1 motion is denied.

## I. FACTUAL BACKGROUND

The facts are drawn from the operative complaint and the documents it incorporates by reference. Those documents include exhibits attached to the complaint and documents the plaintiffs obtained using Section 220 of the Delaware

4

General Corporation Law.[2] Any additional facts are either not subject to reasonable dispute or suitable for judicial notice.[3]

## A.    The Company

Murdoch founded Fox News with Roger Ailes in 1996. In 2016, after Ailes resigned, Murdoch became Chairman and CEO of Fox News and Fox Business Network.

In 2019, Twenty-First Century Fox spun off Fox as a publicly traded entity. From the outset, Fox has been a controlled company with a dual-class voting structure. Class B stockholders are entitled to vote in all matters on which stockholders have the right to vote, including director elections. Class A stockholders vote only on major decisions, such as dissolution or a sale of all the Company's assets.

Murdoch controls Fox through the Murdoch Family Trust, which owns 43.4% of Fox's Class B voting shares. Those shares constitute 18% of the total equity, creating a wedge between Murdoch's level of control and his economic exposure.

Murdoch also serves as Chair of the Fox Board and as Executive Chair of Fox News Network, LLC. That entity is a wholly owned Fox subsidiary that operates the

---

[2] 8 *Del. C.* § 220.

[3] Citations in the form "Compl. ¶ ___" refer to paragraphs in the operative complaint. Citations in the form "Ex. [letter] at ___" refer to exhibits attached to the operative complaint. Citations to "DOB at ___" refer to Defendants' Opening Brief in Support of Their Motion to Dismiss, and citations in the form "Ex. [number] at ___" refer to exhibits to that brief. Citations in the form "PAB at ___" refer to Plaintiff's Answering Brief in Opposition to Defendants' Motion. Citations in the form "DRB at ___" refer to Defendants' Reply Brief in Support of Their Motion.

flagship Fox News Channel, the Fox Business Channel, Fox News Radio, and Fox News Digital. When referring to "Fox News," this decision means both the LLC and the channels it operates.

Fox News is the Company's biggest money maker. It reaches an estimated seventy-seven million Americans, giving it the largest digital reach of any news network. For over twenty consecutive years, Fox News has been the top-rated national cable news network for weekday primetime and total-day viewing.

Fox News is part of Fox's Cable Network Programming division, which also includes Fox Business and Fox Sports Networks. In 2022, the cable division accounted for 44% of Fox's revenues and 99% of adjusted EBITDA.

The complaint alleges that Fox News pursues a business model that caters to the beliefs of its target audience at the expense of the truth. Under that business model, Fox News "promotes political narratives without regard for whether the underlying factual assertions [are] true or based on sources worthy of credit."[4]

The complaint alleges that when promoting political narratives, Fox News strives to "appeal[] to attitudes and anxieties of a particular demographic—aging, right-leaning baby boomers."[5] But Fox News is not the only news organization targeting that demographic. Fox News is the dominant player within a larger conservative media ecosystem that includes competitors like America News,

---

[4] Compl. ¶ 4.

[5] *Id.* ¶ 74.

Newsmax, and Breitbart.[6] Fox News is always looking over its shoulder to make sure that its competitors do not siphon away its viewers and undermine its leading position.

## B. The 2020 Election

The complaint focuses primarily on how Fox News covered the 2020 general presidential election, placing particular emphasis on how Fox News changed its coverage after an unexpected decline in ratings.

Late in the evening on Election Day, November 3, 2020, Fox News called Arizona for Biden. The Trump campaign urged Fox News to reverse the call, but to no avail.

On November 4, 2020, Trump declared that he had won the 2020 election. He also claimed there had been widespread election fraud.

On November 7, 2020, despite Trump's claims, Fox News called the election for Biden. The Fox News audience rebelled.

Between November 4 and 11, 2020, Fox News' ratings fell dramatically. Internally, Fox calculated that favorability ratings for Fox News primetime shows dropped from 70% to 25%. The primetime audience for Fox News declined by 37%. The daytime audience for Fox News declined by 34%.

Two Fox competitors—America News and Newsmax—supported Trump's election-fraud theories. Their favorability ratings and audience share leapt upward.

---

[6] *Id.* ¶¶ 79, 125.

In response to the viewer backlash, Murdoch, Lachlan, and Suzanne Scott, the CEO of Fox News, decided to indulge and amplify Trump's election-denial narrative.

## C.     The Dominion And Smartmatic Election-Fraud Stories

One of Trump's election-fraud theories focused on voting machines manufactured by Dominion and voting software written by Smartmatic. On November 8, 2020, Fox News host Maria Bartiromo interviewed Sidney Powell, a Trump legal advisor. She and Rudy Giuliani led a Trump legal team that was filing election-fraud lawsuits.

Powell claimed on air that there had been a "massive and coordinated effort to steal this election," which involved "flipping votes in the computer system, or adding votes that did not exist."[7] The source for Powell's assertions turned out to be someone who described herself as an "internally decapitated" time-traveler with clairvoyant powers who learned about the election fraud through dreams and while time-traveling in a semi-conscious state.[8]

The accusations against Dominion and Smartmatic included the following:

● Dominion voting machines ran Smartmatic software that allowed the operators to manipulate the vote totals.

● Dominion used a fraudulent algorithm designed to flip votes from Trump to Biden.

● Dominion was owned by a company from Venezuela that rigged elections for Hugo Chavez.

---

[7] *Id.* ¶ 129.

[8] *Id.* ¶ 128.

- Dominion paid kickbacks to election officials.

Between November 8, 2020, and January 26, 2021, Fox News hosts like Lou Dobbs and Bartiromo reported favorably on the stories accusing Dominion and Smartmatic of election fraud. They also hosted guests who championed those stories without pushing back on the guests' claims.

## D. The Cease-And-Desist Letters

On November 20, 2020, Dominion sent a cease-and-desist letter to Fox News General Counsel Lily Fu Claffee. The letter detailed Fox News' coverage of Dominion and provided evidence that the coverage included false claims. The letter urged Fox to "correct the most outlandish of these false allegations it has helped to perpetuate" and to "ensure that future reporting about Dominion is both fair and accurate."[9] Dominion wrote that it was "prepared to do what is necessary to protect its reputation and the safety of its employees," implying that Dominion would sue Fox if necessary.[10]

On December 10, 2020, Smartmatic sent Claffee a letter detailing nine categories of false statements that Fox News hosts, primarily Dobbs and Bartiromo, had broadcast about Smartmatic. Like Dominion, Smartmatic provided evidence of their falsity, including (i) that Smartmatic was not a Venezuelan company and (ii) that Smartmatic's technology was used in only one county, not widely as the Fox News programming claimed. The letter demanded a "full and complete retraction of

---

[9] Ex. A at 1.

[10] *Id.*

9

all false and defamatory statements" and threatened litigation seeking "hundreds of millions, if not billions, of dollars."[11]

On December 22, 2020, Dominion sent a follow-up letter to Claffee. That letter demanded that Fox News "issue a retraction to make clear there is simply no evidence to support the conspiracy theories that continue to smear the company's good name."[12] Dominion also insisted that Fox News "ensure that any stories about Dominion are thoroughly fact-checked and vetted by experienced editors."[13] The letter warned that Dominion was preparing a lawsuit for defamation and would "prefer to focus on holding Ms. Powell and her network of liars and conspiracy theorists accountable rather than adding Fox News, Fox Business, or its journalists to that complaint."[14]

On January 28, 2021, Smartmatic sent another retraction demand to Fox counsel. That letter identified additional statements that Fox News, its anchors, and its guests published about Smartmatic, which Smartmatic contended were defamatory. The letter reiterated Smartmatic's demand "that Fox News immediately

---

[11] Ex. D at 19–20.

[12] Ex. E at 7.

[13] *Id.*

[14] *Id.* at 7–8.

correct the record by publishing full and complete retractions of all its false and defamatory statements regarding Smartmatic."[15]

Fox did not respond to the letters. Fox did not retract any of Fox News' assertions about Dominion and Smartmatic committing election fraud.

### E.    The Dominion Litigation

On March 26, 2021, Dominion sued Fox News for defamation in Delaware Superior Court. Dominion sought lost profits of not less than $600 million, lost enterprise value of not less than $1 billion, and reimbursement of $1.3 million spent on security and on combatting disinformation. Dominion also sought punitive damages.

Fox News moved to dismiss the complaint for failing to state a claim on which relief could be granted. On December 16, 2021, the Superior Court denied the motion to dismiss, holding that Dominion's complaint adequately pled the elements of defamation, including actual malice. The Superior Court rejected Fox's neutral reporting defense at the pleading stage.

On March 31, 2023, the Superior Court ruled on cross-motions for summary judgment. The Superior Court granted summary judgment in Dominion's favor, holding that the statements at issue were false. The Superior Court also held that the statements were defamatory *per se*. But the Superior Court found that genuine issues of material fact remained as to whether Fox News acted with actual malice,

---

[15] Ex. F at 7.

11

meaning a jury would have to decide that issue. The Superior Court again rejected Fox's neutral reporting defense as a matter of law.

Trial was scheduled to begin on April 18, 2023. That morning, before the trial started, Fox settled with Dominion for $787.5 million.

The Dominion settlement was not the only settlement during that period resulting from a defamation claim. Shortly before the Dominion settlement, Fox settled a related defamation lawsuit by Venezuelan businessman Majed Khalil for an undisclosed sum. Dobbs, one of the Fox News hosts principally involved in the spreading the accusations against Dominion and Smartmatic, had described Khalil as a "liaison of Hezbollah" who had used Dominion and Smartmatic to accomplish "a cyber Pearl Harbor" in the 2020 election.[16]

## F.    The Smartmatic Litigation

On February 4, 2021, Smartmatic sued Fox, Fox News, Dobbs, Bartiromo, Giuliani, Powell, and Jeanine Pirro in the Supreme Court of the State of New York. Smartmatic sought actual, consequential, and special damages of not less than $2.7 billion. Smartmatic also sought punitive damages. Experts have speculated that the settlement value of the case exceeds $1 billion.

---

[16] Compl. ¶ 209.

The defendants moved to dismiss the complaint for failing to state a claim on which relief can be granted. The New York Court denied the motion, holding that Smartmatic's "meticulously detailed complaint" stated a claim for defamation.[17]

Smartmatic and Fox are still conducting discovery. A Fox spokesperson projected that trial likely will occur in 2025.

## G. The Epps Story

Meanwhile, Fox News covered another allegedly false story. In January 2021, Trump supporter Ray Epps traveled to Washington, D.C., to protest Biden's certification as the winner of the 2020 presidential election. On January 5, an attendee at a Trump protest livestreamed Epps shouting: "Tomorrow, we need to go into the Capitol! Into the Capitol! Peacefully!"[18] On January 6, a video showed Epps on the Capitol grounds whispering in the ear of a protestor just before that protestor and others charged through a police barricade.

On June 14, 2021, an online media outlet called *Revolver News* claimed there was a "strong possibility" Epps was a federal agent who helped organize the January 6 breach of the Capitol as a false flag operation.[19] The next day, Fox News host Tucker Carlson embraced the theory, claiming "FBI operatives were organizing the attack

---

[17] *Id.* ¶ 201.

[18] *Id.* ¶ 215.

[19] *Id.* ¶ 218.

on the Capitol."[20] On October 25, *Revolver News* ran another story describing Epps as a "fed-protected provocateur" who led the attacks on the Capitol.[21] That same day, Carlson presented the story in a favorable light. Over the ensuing months, Carlson continued to advance the Epps-as-federal-agent story. As late as March 11, 2023, Carlson stated on a podcast that "Ray Epps clearly was working for somebody. He was not a pure civilian."[22]

On March 23, 2023, Epps sent Fox a letter demanding a retraction and threatening to sue for defamation. Epps claimed on *60 Minutes* that he and his wife suffered harassment after Carlson's claims and had to live in a recreational vehicle in an undisclosed location.

Epps filed suit against Fox News on July 10, 2023, for defamation and false lights. Epps seeks compensatory and punitive damages. The litigation remains pending.

## H.     Procedural History

The plaintiffs filed the operative complaint on April 26, 2024. It contains two counts.

---

[20] *Id.*

[21] *Id.* ¶ 219.

[22] *Id.* ¶ 221.

Count I asserts claims for breach of fiduciary duty against Murdoch and Lachlan in their capacities as Fox officers and directors.[23] Count I also asserts claims for breach of fiduciary duty against Scott, the Fox News CEO, and Viet Dinh, Fox's general counsel, in their officer capacities. Count I contends those defendants oversaw and implemented a "programming strategy" of "airing hosts and guests who propagated unfounded conspiracy theories falsely accusing Dominion and Smartmatic of election fraud."[24] The complaint asserts that the officer defendants breached their fiduciary duties by acting in bad faith "to pursue profits through tortious misconduct."[25]

Count II asserts that outside directors Chase Carey, Paul Ryan, Jacques Nasser, Anne Dias, and Roland Hernandez breached their fiduciary duties by "consciously disregard[ing] the risk of tort liability from actionable defamation."[26] Count II also asserts that the outside directors "failed to act in good faith to establish information and reporting systems that mitigate defamation risk" and "disregarded red flags respecting defamation liability to Dominion and Smartmatic."[27]

---

[23] Murdoch and Lachlan also owe fiduciary duties in their capacities as stockholder controllers. The complaint does not assert claims against them in that capacity.

[24] Compl. ¶ 296.

[25] *Id.* ¶ 295.

[26] *Id.* ¶ 299.

[27] *Id.*

## II.        LEGAL ANALYSIS

The defendants have moved to dismiss the complaint under Court of Chancery Rule 23.1. That motion asserts that the stockholder plaintiffs lack standing to assert a claim belonging to the corporation.

"A cardinal precept of Delaware law is that directors, rather than shareholders, manage the business and affairs of the corporation."[28] Section 141(a) of the Delaware General Corporation Law instantiates that board-centric model by stating that "[t]he business and affairs of every corporation organized under this chapter *shall be managed by or under the direction of a board of directors*, except as may be otherwise provided in this chapter or in its certificate of incorporation."[29] The board's authority to govern corporate affairs extends to decisions about what actions the corporation should take after being harmed, including whether the corporation should sue its present or former fiduciaries.

"In a derivative suit, a stockholder seeks to displace the board's decision-making authority over a litigation asset and assert the corporation's claim."[30] By its very nature, therefore, the attempt to assert a derivative action encroaches on the managerial freedom of directors. In order for the stockholder to assert the corporate claim, the stockholder must either (i) obtain express permission from the board,

---

[28] *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. 2021) (cleaned up).

[29] 8 *Del. C.* § 141(a) (emphasis added).

[30] *Zuckerberg*, 262 A.3d at 1047 (internal quotation marks omitted).

(ii) receive implicit permission to proceed as a result of the board taking no position on the litigation, (iii) ask the board for permission and show that the board wrongfully refused to pursue the action or permit the stockholder to proceed, or (iv) show that it would have been futile to ask the board for permission because the board lacked a disinterested and independent majority that could consider a demand to sue.

Court of Chancery Rule 23.1 implements these substantive requirements at the pleading stage by requiring that the complaint in a derivative action allege particularized facts sufficient to support a reasonable inference that the stockholder can proceed with the litigation. Court of Chancery Rule 23.1 requires that the complaint in a derivative action "state with particularity" both "(A) any effort by the derivative plaintiff to obtain the desired action from the entity; and (B) the reasons for not obtaining the action or not making the effort . . . ."[31] By taking this approach, Rule 23.1 ensures that "demand principles can be applied at the outset of a case."[32]

The requirement to plead with particularly "differ[s] substantially from . . . permissive notice pleadings."[33] Under the heightened pleading requirements of Rule 23.1, "conclusionary [sic] allegations of fact or law not supported by allegations of specific fact may not be taken as true."[34] But the plaintiff "need not plead

---

[31] Ct. Ch. R. 23.1(a).

[32] *Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 2023 WL 3093500, at *29 (Del. Ch. Apr. 26, 2023).

[33] *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).

[34] *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988).

evidence."[35] And when evaluating the complaint, the court still "must accept as true all of the complaint's particularized and well-pleaded allegations, and must draw all reasonable inferences in the plaintiff's favor."[36] In other words, if the pleading supports competing inferences, both of which are reasonable, then the court must adopt the plaintiff-friendly inference. The court cannot draw a defense-friendly inference at the pleading stage, even if that inference seems relatively stronger than a competing (and reasonable) plaintiff-friendly inference.

When conducting a demand-futility analysis, the court asks whether the board in place when the complaint was filed had a majority of directors who could make an independent and disinterested decision about whether to assert the claims articulated in the complaint. The analysis proceeds on a claim-by-claim and director-by-director basis.[37] As to each claim, the court imagines that the plaintiff made a demand on the board to assert that claim. The court then asks for each director:

> (i) Did the director received a material personal benefit from the alleged misconduct that is the subject of the claim?
>
> (ii) Does the director face a substantial likelihood of liability on the claim?

---

[35] *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984) (subsequent history omitted); *accord Brehm*, 746 A.2d at 254 ("[T]he pleader is not required to plead evidence.").

[36] *Zuckerberg*, 262 A.3d at 1048.

[37] *See, e.g.*, *Khanna v. McMinn*, 2006 WL 1388744, at *14 (Del. Ch. May 9, 2006) ("This analysis is fact-intensive and proceeds director-by-director and transaction-by-transaction."); *Beam v. Stewart (Beam I)*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003) ("Demand futility analysis is conducted on a claim-by-claim basis."), *aff'd*, 845 A.2d 1040 (Del. 2004).

(iii) Does the director lack independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the claim or who would face a substantial likelihood of liability on the claim?[38]

If the answer to any of the questions is "yes," then that director is disqualified for purposes of the Rule 23.1 analysis of that claim. If the answer to any of the questions is "yes" for at least half of the members of the demand board, then the plaintiff has standing to assert that claim. If other claims arise out of the same nucleus of operative facts, then demand is excused for those other claims as well, and the plaintiff can assert them too.[39] But if other claims arise out of a different nucleus of operative facts, then the court repeats the process for those claims.

When the plaintiffs filed this action, the Board had eight members: Murdoch, Lachlan, Carey, Nasser, Ryan, Dias, Hernandez, and William Burck (the "Demand Board"). To have standing to assert a claim, the plaintiffs must plead particularized facts that supply a reason to doubt that at least four members of the Demand Board could have exercised disinterested and independent judgment when deciding whether to assert that claim.

The plaintiffs seek to disqualify the members of the Demand Board by showing that a sufficient number of directors either (i) face a substantial risk of liability on the claims in the complaint or (ii) cannot act independently of Murdoch. To streamline the analysis, this decision starts with the claims against Murdoch. The complaint

---

[38] *See Zuckerberg*, 262 A.3d at 1059.

[39] *Walton*, 2023 WL 3093500, at *29.

pleads particularized facts supporting a reasonable inference that Murdoch faces a substantial likelihood of liability on Count I, meaning that he cannot disinterestedly consider whether the Company should assert the claims against him. This decision then examines whether other directors could act independently when deciding whether the Company should assert claims against Murdoch. At least three directors cannot consider that question independently. The plaintiffs' other claims arise out of the same nucleus of operative facts, so the Demand Board cannot consider them either. Demand is therefore futile and excused, and the Rule 23.1 motion is denied.

## A. Count I

Count I alleges that Murdoch acted in bad faith by causing Fox News to pursue "a tortious business model of propagating factually unfounded, defamatory conspiracy theories, without institutionalized policies of fact-checking, retractions, or assessment of defamation risk."[40] Demand is futile for Count I.

### 1. Murdoch

The plaintiffs seek to raise a reasonable doubt about Murdoch's ability to decide whether the Company should assert Count I by arguing that he faces a

---

[40] Compl. ¶ 295.

substantial risk of liability on that claim. The plaintiffs have pled facts supporting that inference.

### a.     The *Massey* Claim

The plaintiffs' lead claim against Murdoch is best understood as a *Massey* claim. A *Massey* claim asserts that fiduciaries made an affirmative decision to violate the law. A conscious decision to violate the law constitutes bad faith conduct and breaches the duty of loyalty.[41]

A core part of a fiduciary's job is to make business judgments about whether a project is likely to increase the corporation's value for the ultimate benefit of its stockholders.[42] That requires identifying and assessing risk, including both legal and business risk.

What a corporate fiduciary cannot do, however, is make a business judgment to cause or allow the corporation to break the law. "Delaware law does not charter law breakers."[43] As the *Massey* decision explained,

> Delaware law allows corporations to pursue diverse means to make a profit, subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue "lawful business" by "lawful acts." As a result, a fiduciary of a Delaware corporation cannot be loyal to a

---

[41] *See Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton (Walmart Laches)*, 294 A.3d 65, 90, 92 (Del. Ch. 2023).

[42] *See generally McRitchie v. Zuckerberg*, 315 A.3d 518, 539–64 (Del. Ch. 2024); *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *17–21 (Del. Ch. Apr. 14, 2017).

[43] *In re Massey Energy Co.*, 2011 WL 2176479, *20 (Del. Ch. May 31, 2011).

Delaware corporation by knowingly causing it to seek profit by violating the law.[44]

"[I]t is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully. The knowing use of illegal means to pursue profit for the corporation is director misconduct."[45] "[A] fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity."[46] "The business judgment rule plays no role in a decision to proceed in a way that violates the law."[47]

Sophisticated and well-advised individuals do not formally document bad-faith decisions, so rarely will there be direct evidence to support a *Massey* claim. Instead, "the court looks at a series of fiduciary inactions and actions, made over time, to determine whether they support an inference that the corporate fiduciaries were operating in bad faith."[48] "A strong pattern of conduct can support an inference that the corporate fiduciaries intentionally decided to cause the corporation to violate the law, typically because the costs and other burdens associated with compliance would

---

[44] *Id.* (footnote omitted).

[45] *Desimone v. Barrows*, 924 A.2d 908, 934–35 (Del. Ch. 2007) (footnote omitted).

[46] *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004).

[47] *Walton*, 2023 WL 3093500, at *34.

[48] *Walmart Laches*, 294 A.3d at 90–91.

cut into profits."[49] When asserting a *Massey* claim, a plaintiff seeks to muster sufficient circumstantial indications of conscious law breaking to plead and later prove that the corporation's fiduciaries inferably made a decision to violate the law.

### b. Defamation As A Source Of Corporate Trauma

Delaware oversight cases have generally involved corporate traumas resulting from statutory or regulatory violations. In this case, the complaint alleges that Murdoch and the other defendants exposed Fox to a corporate trauma resulting from a common law source—the tort of defamation. Sensibly, the defendants have not argued that oversight liability cannot arise from a corporate trauma grounded in common law liability. The common law is just as much "the law" as statutory law, particularly for a well-established doctrine like defamation.

Here, the corporate trauma allegedly resulted from Fox News engaging in defamation. Liability for defamation requires that a plaintiff prove: (1) a defamatory communication, (2) publication, (3) reference to the plaintiff, (4) a third party's understanding of the communication's defamatory character, and (5) injury.[50] Some communications are defamatory *per se*, including statements that "malign one in a trade, business or profession."[51] A plaintiff can sue over a communication that is

---

[49] *Walton*, 2023 WL 3093500, at *32.

[50] *See Preston Hollow Cap. LLC v. Nuveen LLC*, 216 A.3d 1, 9 (Del. Ch. 2019).

[51] *Id.* at *10.

defamatory *per se* without showing a distinct injury.[52] When the communication involves a public figure, a successful suit for defamation requires that the speaker publish the statement with "actual malice," i.e., with knowledge that it was false or with reckless disregard of whether or not it was false.[53]

For a *Massey* claim, the plaintiffs must plead facts supporting a reasonable inference that a corporate fiduciary faces a substantial risk of liability for causing (or consciously allowing) a corporation to violate the law. No one disputes that Murdoch was a fiduciary in his capacities as Chair of the Board and Executive Chair of Fox News. To state a *Massey* claim against Murdoch, the complaint must plead facts supporting a reasonable inference that Murdoch intentionally caused the Company to engage in defamation.

Trial judges do not possess telepathic powers. All a trial judge can do is consider the allegations in the record and infer whether the fiduciary acted with a particular intent.

> A strong pattern of conduct can support an inference that the corporate fiduciaries intentionally decided to cause the corporation to violate the law, typically because of the cost of compliance and its effect on profits. It is highly unlikely that any formal record of such a decision would exist, nor will there be an after-the-fact confession. What will exist are external manifestations from which, using the theory of mind, an external observer like a judge or a jury can infer conscious intent.[54]

---

[52] *Id.*

[53] *Page v. Oath Inc.*, 270 A.3d 833, 844 (Del. 2022).

[54] *Walton Laches*, 294 A.3d at 91.

The facts may include hallmarks of other claims, such as a persistent failure to implement a monitoring system for an obvious central compliance risk or a pattern of chancing upon red flags, yet persistently failing to act or resorting to only cosmetic action. The most telling indications include steps to encourage, enable, or profit from noncomplaint [sic] behavior.[55]

The key allegations against Murdoch involve interactions with Lachlan and Scott. During those interactions, Murdoch assessed the content of Fox News' programming and commented on it. The complaint's allegations support a reasonable inference that Murdoch understood that Fox News was broadcasting defamatory content and approved it. The complaint therefore states a claim that Murdoch knowingly caused the corporation to violate the law.

i. **Murdoch Inferably Knew About The Dominion And Smartmatic Stories.**

The complaint alleges particularized facts supporting an inference that Murdoch was deeply involved in the daily operations of Fox News, closely monitored the content of its broadcasts, and knew about the defamatory stories.

- Scott, who was named CEO of Fox News and Fox Business Network in 2018, reports to Murdoch and Lachlan jointly. In the Dominion litigation, Scott testified that Murdoch and Lachlan are her bosses and that she communicates with them regularly, often daily.[56]

- Murdoch was in close contact with Scott from November 2020 through January 2021. They discussed the content and direction of Fox News, including narratives, topics, and guests, plus how to cover Trump's claims of a stolen

---

[55] *Walton*, 2023 WL 3093500, at *33. That does not mean that a plaintiff could not plead or prove that a fiduciary decided on a discrete occasion to cause a corporation to violate the law. If there were a confession, then liability could attach based on a single act. A pattern of conduct, however, usually will be necessary to support an inference of conscious law-breaking.

[56] Compl. ¶ 56.

election.[57] When in New York, Murdoch attended twice-daily meetings of the editorial leadership team that discussed and made decisions about topics, segments, guests, and monologues.[58]

- Murdoch routinely suggested potential stories for Fox News and Fox Business to cover. He also recommended guests for appearances on Fox News and Fox Business.[59]

- Murdoch received twice daily reports on viewership. He receives a preliminary rating assessment called the "overnights" early in the morning. Later in the day, Murdoch and the rest of the executive team receive an "executive scorecard" of ratings.[60]

Those allegations support an inference that Murdoch knew about the defamatory stories.

ii. **Murdoch Inferably Knew That The Stories About Dominion And Smartmatic Were Unfounded.**

The complaint alleges particularized facts supporting a reasonable inference that Murdoch knew that the accusations against Dominion and Smartmatic were unfounded.

- Murdoch tried to influence Trump to concede the presidential election.[61]

- Murdoch's media companies ran stories recognizing that Trump's accusations were false.

---

[57] *Id.* ¶ 127.

[58] *Id.* ¶ 241.

[59] *Id.* ¶ 241

[60] *Id.* ¶ 242.

[61] *Id.* ¶ 113.

- On November 5, 2020, the Murdoch-controlled *New York Post* ran an article entitled, "Downcast Trump makes baseless election fraud claims in White House address[.]"[62]

- On November 7, 2020, Murdoch revised a *New York Post* editorial calling for Trump to stop advancing conspiracy theories about a stolen election. The editorial stated: "[T]he president's aides have shown no evidence that the election was 'stolen.' . . . It undermines faith in democracy, and faith in the nation, to push baseless conspiracies. Get Rudy Giuliani off TV . . . . If Trump persists in wild talk to the contrary, he'll lead his people into irrelevance and marginalize his own voice."[63]

- On November 8, 2020, Murdoch complained to Scott about CNN coverage describing Fox News as "enabling and encouraging Trump's election denialism."[64] If the Fox News stories had been accurate, Murdoch would have had no grounds to complain.

- By November 13, 2020, the Fox News Brainroom had produced memos rejecting claims that Dominion voting machines had deleted or switched votes. Those memos circulated widely within Fox, and it is reasonable to infer that Murdoch saw them.[65]

- Murdoch watched a press conference that Guiliani and Powell held on November 19, 2020.

  - He texted during the press conference, "Really crazy stuff. And damaging."[66]

  - Afterwards, he sent an email in which he wrote: "Just watched Giuliani press conference. Stupid and damaging. The only one encouraging Trump and misleading him. Both increasingly mad."[67]

---

[62] *Id.* ¶ 113.

[63] *Id.* ¶ 116.

[64] *Id.* ¶ 130.

[65] *Id.* ¶ 139.

[66] *Id.* ¶ 148.

[67] *Id.*

- Murdoch admitted in testimony during the Dominion litigation that the 2020 election "was not stolen" from Trump and that he always thought that the vote-counting process was on the "up-and-up."[68]

- Murdoch admitted in testimony from the Dominion litigation that he had "seen no evidence" that Dominion committed election fraud.[69]

- Murdoch admitted in testimony from the Dominion litigation that he did not believe Dominion had engaged in election fraud.[70]

Those assertions go beyond allegations. They plead evidence. To reiterate, they support a reasonable inference that Murdoch knew that the accusations against Dominion and Smartmatic were baseless.

### iii. Murdoch Inferably Permitted The Unfounded Stories To Air.

The complaint alleges particularized facts supporting a reasonable inference that Murdoch had the power to stop the unfounded stories about Dominion and Smartmatic from airing. Considered together with the allegations supporting an inference that Murdoch knew the stories were false, those allegations support a reasonable inference that Murdoch consciously allowed the stories to air. The complaint goes further and alleges particularized facts supporting a reasonable inference Murdoch made an affirmative decision to air the stories.

---

[68] *Id.* ¶ 114.

[69] *Id.* ¶ 134.

[70] *Id.*

In the Dominion litigation, Murdoch testified under oath that he could have stopped Fox News from having Giuliani as a guest on its programs.[71] He did not intervene, which creates an inference that Murdoch knowingly permitted Fox News to air the false claims about election fraud that Giuliani was spreading.

The complaint alleges that on November 8, 2020, Murdoch, Lachlan, and Scott had a "long talk" about mounting viewer backlash and the direction of Fox's coverage of Trump's challenges to the election.[72] The complaint alleges that during that meeting, Murdoch, Lachlan, and Scott "decided that Fox News would amplify Trump's lawsuits and claims of election fraud while waiting for Trump to concede."[73]

The complaint alleges that, in an email dated November 9, 2020, Scott wrote to Murdoch: "Pivot but keep the audience who loves and trusts us . . . we need to make sure they know we aren't abandoning them and [are] still champions for them."[74] That email can support different inferences. At this stage, the court must draw the plaintiff-friendly inference that Scott suggested de-emphasizing the defamatory stories about Dominion and Smartmatic while still airing them to placate conservative viewers.

---

[71] *Id.* ¶ 245.

[72] *Id.* ¶ 131.

[73] *Id.*

[74] *Id.* ¶ 132 (alteration in original).

29

Even without Murdoch's testimony or the Scott email, the complaint pleads facts supporting an inference that Murdoch decided Fox News would continue to air the defamatory stories about Dominion and Smartmatic. As Executive Chair of Fox News, Murdoch closely monitored Fox News' programming and knew about the Dominion and Smartmatic coverage. The plaintiffs credibly allege that because of his dominant position, Murdoch could control the stories, hosts, and guests that went on Fox News. The fact that Fox News kept broadcasting the stories meant that Murdoch decided that would happen.

### iv. Murdoch's Motive

Although alleging a motive is not necessary to support an inference of bad faith,[75] the complaint pleads particularized facts that point to an obvious motive for Murdoch's decision to have Fox News air the unfounded Dominion and Smartmatic stories: Murdoch was responding to a backlash among conservative viewers to maintain Fox News' leadership position.

After Fox News called Arizona and later the election for Biden, conservative viewers began abandoning Fox News. Murdoch received a weekly "Brand Protection"

---

[75] *See In re Walt Disney Co. Deriv. Litig.* (*Disney I*), 907 A.2d 693, 754 (Del. 2005) ("It makes no difference [for the purpose of finding bad faith] the reason why the director intentionally fails to pursue the best interests of the corporation."), *aff'd*, 906 A.2d 27 (Del. 2006); *Nagy v. Bistricer*, 770 A.2d 43, 48 n.2 (Del. Ch. 2000) ("[R]egardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes."); *accord IBEW Local Union 481 Defined Contribution Plan & Tr. v. Winborne*, 301 A.3d 596, 623 (Del. Ch. Aug. 24, 2003) (citing *Disney I*, 907 A.2d).

report that included a "summary of the strong conservative and viewer backlash to Fox that we are working to track and mitigate." Continuing, the report warned:

> This week we continued to see extremely high levels of conservative discontent towards Fox News, both on social media and in the pro-Trump commentariat. Roughly half of the top 100 tweets and a third of the top 100 Facebook posts mentioning Fox News were from angry conservatives criticizing Fox or threatening to boycott the network. Both Donald Trump and Newsmax have taken active roles in promoting attacks on Fox News, including by pushing leaked footage and false reports about Fox News talent.[76]

To address the conservative viewer exodus, Fox News needed to support Trump's election-fraud claims, even though Murdoch knew they weren't true.

### v.    The Defendants' Arguments.

The defendants offer a series of arguments designed to undermine the inference that Murdoch acted in bad faith by consciously causing or willfully permitting Fox News to broadcast defamatory content about Dominion and Smartmatic. To distance Murdoch from the decisions, the defendants seek to shift responsibility to the Board. None of the defendants' arguments are persuasive.

First, the defendants argue that "[t]he complaint does not allege that any of the directors watched [the Dominion- and Smartmatic-related] broadcasts when they were aired between November 8, 2020 and January 26, 2021—or at any point before Dominion and Smartmatic sued."[77] That argument does not undermine Murdoch's culpability. Moreover, a person can know about a broadcast or program without

---

[76] Compl. ¶ 122.

[77] DRB at 14 (alteration in original).

having watched it personally. Think of *Game of Thrones* or any other trending show that people talk about. The plaintiffs are entitled to an inference that the directors knew about the broadcasts.

Second, the defendants argue that "knowledge that voting fraud allegations were false would not translate to notice of defamation liability" and that "falsity alone is not enough to establish defamation liability."[78] True but here, Fox News was making, boosting, and endorsing false communications, many of which were defamatory *per se*. They referred specifically to Dominion and Smartmatic. Their defamatory character was self-evident. Fox News hosts and guests did not merely note that some folks were making those types of claims. They advanced, endorsed, and adopted those claims as true.[79] The plaintiffs are entitled to an inference that the Murdoch knew that this conduct would give rise to liability for defamation.

Third, the defendants argue that a decision about whether to retract stories in response to cease-and-desist letters could be a protected exercise of business judgment.[80] The defendants argue that a retraction could have been viewed as an admission of guilt, so Fox News had good reason not to issue retractions. But the operative question is not whether Fox News should have issued a retraction. The operative question is whether Murdoch acted in bad faith by consciously causing or

---

[78] *Id.* at 16.

[79] *See* Compl. ¶ 137.

[80] *See* DRB at 18 ("[W]hether to issue a requested retraction is nuanced, and implicates matters of legal and business judgment.").

willfully allowing Fox News to issue defamatory stories about Dominion and Smartmatic. If Fox News had issued a retraction, then it might have helped support an argument about mistake or lack of willfulness. It also might have helped mitigate the Company's damages. Arguments about possible retractions do not negate the plaintiff-friendly inference that Murdoch acted in bad faith by consciously causing or willfully allowing Fox News to broadcast defamatory stories about Dominion and Smartmatic.

Fourth, the defendants introduce a pseudo-reliance-on-counsel defense. "Unless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it, dismissal of the complaint based upon an affirmative defense is inappropriate."[81] The defendants are free to waive the attorney-client privilege and invoke an advice-of-counsel defense at a later stage of the proceeding. For present purposes, the possibility of an advice-of-counsel defense does not negate the plaintiff-friendly inference that Murdoch acted in bad faith by consciously causing or willfully allowing Fox News to broadcast defamatory stories about Dominion and Smartmatic.

Fifth, the defendants argue that directors do not "incur *Caremark* liability by not adopting plaintiffs' preferred strategy for responding to legal claims commenced or threatened against the corporation."[82] Obviously true. And not a basis for a

---

[81] *Reid v. Spazio*, 970 A.2d 176, 183–84 (Del. 2009).

[82] DRB at 18.

pleading-stage dismissal. The significant threat of liability in this case results from the allegations about Murdoch causing Fox News to make defamatory statements, not what to do about the actual or threatened lawsuits.

None of the defendants' arguments undermine the inference that Murdoch faces a substantial likelihood of liability for consciously causing or willfully allowing Fox News to broadcast defamatory content. That does not mean that the plaintiffs will prevail at trial. It rather recognizes that a plaintiff need only "make a threshold showing, through the allegation of particularized facts, that their claims have some merit."[83]

### c. Murdoch Is Inferably Disqualified.

The complaint sufficiently pleads that Murdoch faces a substantial likelihood of liability for consciously causing or willfully allowing Fox News to broadcast defamatory content. That means a reasonable doubt exists about whether Murdoch could make a disinterested decision about whether to cause the Company to assert those claims. Murdoch is therefore disqualified for purposes of the Rule 23.1 analysis of Count I of the complaint.

### 2. Lachlan

The complaint alleges that Lachlan cannot make an independent and disinterested decision about whether to assert the claims in the complaint. First, he is not independent because he is Murdoch's son. Second, he is not disinterested

---

[83] *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

because he too faces substantial likelihood of liability on the claims. Both arguments are right.

"Close familial relationships between directors can create a reasonable doubt as to impartiality."[84] For that reason alone, Lachlan lacks independence from Murdoch. Murdoch faces a substantial likelihood of liability on Count I, and Lachlan therefore cannot make an independent decision about whether the Company should assert that claim against his father.

In addition, Lachlan faces a substantial likelihood of liability for the same reasons as Murdoch. If anything, the claim against Lachlan is stronger, because Lachlan engaged in more frequent communication with Scott, his direct report, about Fox News and its content, and he regularly texted comments to Scott about Fox News' coverage. Lachlan attended twice-daily editorial leadership team meetings to discuss topics, segments, guests, and monologues. He also worked closely with the newsroom managers on positioning and messaging. [85]

The record contains direct evidence of Lachlan's concern about the viewer backlash against Fox News after the network called Arizona and later the election

---

[84] *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999); *see Grimes v. Donald*, 673 A.2d 1207, 1216 (Del. 1996) (stating a "material financial or familial interest" can justify demand excusal), *overruled on other grounds by Brehm*, 746 A.2d; *Mizel v. Connelly,* 1999 WL 550369, at *4 (Del. Ch. July 22, 1999) (holding grandson could not impartially consider demand adverse to interests of his grandfather); *see also Chaffin v. GNI Gp., Inc.,* 1999 WL 721569 at *5 (Del. Ch. Sept. 3, 1999) (holding the father-director was interested where approval of transaction benefited his son, for purposes of standard of review analysis).

[85] Compl. ¶ 241.

for Biden. When testifying in the Dominion litigation, Lachlan admitted that the decline in Fox News' ratings was "'absolutely' a concern that would 'keep [him] awake.'"[86] He also admitted that he "weighed in on the specific direction on both the 'tone' and 'negativ[ity]' of Fox's news coverage of Trump between November 2020 and January 2021."[87] Lachlan even told Scott "to change the tone of coverage of a Trump rally, saying the hosts needed to 'be careful' and that 'some of the side comments are slightly anti, and they shouldn't be.'"[88] He instructed that even though Trump lost the election, "[t]he narrative should be this is a huge celebration of the president."[89]

Those allegations support an inference that Lachlan consciously caused or willfully permitted Fox News to broadcast accusations about Dominion and Smartmatic that he knew were unfounded and defamatory. That is enough to support an inference that Lachlan acted in bad faith by prioritizing profits over legal compliance.

Lachlan therefore cannot disinterestedly and independently consider whether the Company should assert claims against Murdoch. Because Lachlan is Murdoch's son, he is not independent. And because he faces a substantial likelihood of liability

---

[86] Compl. ¶ 121 (alteration in original).

[87] *Id.* ¶ 246 (alteration in original).

[88] *Id.* ¶ 243.

[89] *Id.*

on those same claims, he is not disinterested. Lachlan is doubly disqualified for purposes of the Rule 23.1 analysis.

### 3.    Two Other Directors

The plaintiffs argue that other members of the Demand Board are not independent of Murdoch and therefore cannot impartially consider whether the Company should assert claims against him. The plaintiffs need only disqualify two directors to render demand futile. They succeed with Carey and Nasser.

### a.    Carey

The complaint alleges facts sufficient to provide reason to doubt Carey's ability to exercise independent judgment about whether to sue Murdoch. He is therefore disqualified for purposes of Rule 23.1.

"Longstanding business affiliations, particularly those based on mutual respect, are of the sort that can undermine a director's independence. Directors who owe their success to another will conceivably feel as though they owe a 'debt of gratitude' to the individual."[90]

In *Match*, the Delaware Supreme Court upheld the Court of Chancery's pleading-stage determination that Thomas McInerney lacked independence from

---

[90] *In re Match Gp., Inc. Deriv. Litig.*, 315 A.3d 446, 472 (Del. 2024) (citation omitted); *see also Marchand v. Barnhill*, 212 A.3d 805, 808 (Del. 2019) (reversing trial court decision and finding there was reason to doubt whether a director could act impartially in deciding whether to sue a CEO due to the director's "longstanding business affiliation and personal relationship with the [CEO's] family"); *id.* at 819 (finding that "personal ties of respect, loyalty, and affection" between a director and CEO's family created a reason to doubt that the director was impartial).

Barry Diller.[91] Diller controlled IAC, where McInerney worked from 1999 to 2012, including a seven-year term as IAC's CFO. During this time, McInerney earned over $55 million. Beginning in 2008, he served as a director for various IAC-affiliated companies, earning over $4.5 million for his services. When leaving IAC, McInenery stated that he was "more than grateful to Barry Diller for the opportunities he and IAC have given me."[92] Based on these allegations, the justices explained that "McInerney's close and pervasive relationship with IAC and Diller are what undercut his independence. McInerney's success resulting directly or indirectly from his relationship with IAC speaks to the 'debt of gratitude' he owes to IAC and Diller for his own success."[93]

As in *Match*, the complaint in this case alleges that Carey has benefitted from a close and longstanding relationship with Murdoch:

- Carey served as a senior executive at Murdoch-affiliated companies from 1988 through 2002, and then again from 2003 through 2015.[94]

- Since 2010, Carey has received over $230 million from his service as a senior executive or director of Murdoch-affiliated companies.[95]

---

[91] 315 A.3d at 452.

[92] *Id.* at 471–72.

[93] *Id.* at 472 n.171.

[94] Compl. ¶¶ 261–64.

[95] *Id.* ¶ 260.

- Carey has served on the board of one or more Murdoch-affiliated companies for the last thirty-two consecutive years.[96]

- After leaving his executive position at Twenty-First Century Fox in 2015, Carey was paid $29.2 million in cash and stock for one year as Executive Vice Chairman, an allegedly "undefined, largely advisory role."[97]

The financial rewards Carey received exceed what the Delaware Supreme Court found sufficient in *Match*.

The complaint also pleads facts suggesting a deep bond of mutual respect between Carey and Murdoch:

- In 2007, Murdoch stated, "I've had the pleasure of working with Chase for almost 20 years and admire and respect him, both as a business leader and personally."[98]

- In 2009, Murdoch stated, "Chase has been one of my closest advisors and friends for years and I am delighted we'll once again be working together across our businesses."[99]

- In 2011, Murdoch endorsed Carey as his emergency successor: "Chase is my partner and if anything happened to me I'm sure he'll get it immediately—if I went under a bus."[100]

- Upon Carey leaving his executive position at Twenty-First Century Fox in 2015, Murdoch stated, "I can't thank Chase Carey enough for his friendship, counsel and leadership over the past decades."[101]

---

[96] *Id.*

[97] *Id.* ¶ 265.

[98] *Id.* ¶ 262.

[99] *Id.* ¶ 263.

[100] *Id.*

[101] *Id.* ¶ 264.

- On the same occasion, Murdoch described Carey as "my close friend and trusted advisor," as well as "a gifted executive and transformative leader and someone I am privileged to call my partner for nearly 30 years."[102]

- On the same occasion, Carey stated, "I want to thank Rupert for the opportunity of a lifetime and for the never-ending support he has offered me as a mentor, colleague and friend."[103]

- In 2020, Carey stated that he had "the privilege and pleasure of talking to Rupert and engaging with Rupert on both the business world as well as on a personal level."[104]

Obviously, friendship is important. So are close relationships, which can help people speak or hear hard truths. But for pleading-stage purposes, a friendship like Murdoch and Carey's creates a reasonable doubt about whether Carey could properly consider a demand to sue Murdoch. The relationship between Carey and Murdoch is inferably closer than what the Delaware Supreme Court found adequate in *Match*.

The defendants' authorities reinforce this conclusion. They cite *Beam*, where the Delaware Supreme Court stated that allegations a director and an interested person "developed business relationships before joining the board, and described each other as 'friends' . . . are insufficient, without more, to rebut the presumption of independence."[105] The justices also stated that a reason to doubt a director's

---

[102] *Id.* ¶ 264.

[103] *Id.* ¶¶ 259, 264.

[104] *Id.* ¶ 266. The complaint also notes that the Board did not appoint Carey to a Fox "Special Committee composed solely of independent directors not affiliated with the Murdoch family." *Id.* At the pleading stage, that decision suggests that the Board did not view Carey as independent either.

[105] *Beam v. Stewart* (*Beam II*), 845 A.2d 1040, 1051 (Del. 2004).

independence could arise "because of financial ties, familial affinity, a particularly close or intimate personal or business affinity."[106] The complaint in this case does not make the type of thin allegations advanced in *Beam*. It advances allegations about the types of "[l]ongstanding business relationships" and feelings of "mutual respect" that the justices found sufficient in *Match*.

The defendants also cite *Zuckerberg* for the proposition that a plaintiff seeking an inference about a lack of independence must satisfy a materiality standard.[107] There, the justices stated that a plaintiff must show that "the director in question had ties to the person whose proposal or actions he or she is evaluating that are sufficiently substantial that he or she could not objectively discharge his or her fiduciary duties."[108] The complaint satisfies that test.

The defendants go further and assert that a plaintiff must plead that a director only lacks independence if the director risked material consequences to his wealth by acting contrary to the other's wishes.[109] That is not the test. Fear of the loss of

---

[106] *Id.*

[107] 262 A.3d at 1061.

[108] *Id.*

[109] DOB at 49 (citing *McElrath v. Kalanick*, 2019 WL 1430210, at *18 (Del. Ch. Apr. 1, 2019), *aff'd*, 224 A.3d 982 (Del. 2020)).

material wealth is a sufficient reason to doubt a director's independence, but it is not a necessary condition for finding a lack of independence.[110]

Under the defendants' proposed rule, a director could owe his wealth and success to an interested party, yet be treated as independent as long as his benefactor could not strip him of his wealth. That is not how gratitude works.[111] As Chief Justice Strine explained while serving as a member of this court,

> Delaware law should not be based on a reductionist view of human nature that simplifies human motivations on the lines of the least sophisticated notions of the law and economics movement. *Homo sapiens* is not merely *homo economicus*. We may be thankful that an array of other motivations exist that influence human behavior; not all are any better than greed or avarice, think of envy, to name just one. But also think of motives like love, friendship, and collegiality, think of those among us who direct their behavior as best they can on a guiding creed or set of moral values.[112]

The plaintiffs have pled sufficiently that Carey owes a debt of gratitude to Murdoch. They need not plead that he also lives in fear of Murdoch.

---

[110] *See Del. Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1023 n.25 (Del. 2015) ("A lack of independence does not turn on whether the interested party can directly fire a director from his day job. It turns on, at the pleading stage, whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party.").

[111] *See Marchand*, 212 A.3d at 820 (inferring that director was not independent of the CEO where the director "owe[d] an important debt of gratitude" to the CEO's family for "giving him his first job, [and] nurturing his progress from an entry level position to a top manager and director").

[112] *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 938 (Del. Ch. 2003) (Strine, V.C.).

Carey is not independent for purposes of deciding whether to assert claims on which Murdoch faces a substantial likelihood of liability. That disqualifies Carey for purposes of the Rule 23.1 analysis.

### b. Nasser

The complaint also alleges facts sufficient to provide reason to doubt Nasser's ability to exercise independent judgment about whether to sue Murdoch.

In addition to pleading longstanding business affiliations, a complaint may plead facts providing reason to doubt a director's independence by pointing to shared membership in "elite and selective clubs."[113] Those relationships must "go beyond simply belonging to the same local country club" and suggest more than a "thin-social circle friendship."[114]

This court's assessment in *BGC* of the relationship between William Moran and Howard Lutnick provides guidance.[115] Lutnick was Cantor Fitzgerald's majority stockholder,[116] and Moran "served on at least one Cantor-affiliated board for sixteen of the past twenty years."[117] The court inferred that Lutnick "trusts, cares for, and respects" Moran and that reciprocally, Moran would want "to maintain a good

---

[113] *In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *37 (Del. Ch. June 11, 2020).

[114] *Id.* (citing *Sanchez*, 124 A.3d at 1022).

[115] *In re BGC P'rs, Inc.*, 2019 WL 4745121 (Del. Ch. Sept. 30, 2019).

[116] *Id.* at *1.

[117] *Id.* at *11

relationship with Lutnick."[118] Moran and Lutnick also enjoyed a close personal

relationship. They attended public events together, honored family members at galas,

and obtained special favors for each other.[119] The court concluded the plaintiffs

"adequately pled a 'constellation of facts' that create a reasonable doubt about

Moran's independence from Lutnick."[120]

The complaint in this case pleads a relationship that goes beyond what the

court held sufficient in *BGC*. It starts with a decades-long personal and social

relationship grounded in a shared heritage as Australian immigrants:

- Nasser and Murdoch have worked together for decades overseeing the American Australian Association (the "Association"), "an elite networking group" founded by Murdoch's father Sir Keith Murdoch in 1948.[121]

- Nasser and Murdoch are founding members of the Association's Advisory Council, which was established in 2005 at an inaugural meeting hosted by Murdoch.[122]

- Nasser and Murdoch have served on the Advisory Council continuously since 2005.[123]

- In 2012, the Association honored Nasser at a gala in Melbourne.[124]

---

[118] *Id.*

[119] *Id.*

[120] *Id.* at *12.

[121] Compl. ¶ 273.

[122] *Id.*

[123] *Id.*

[124] *Id.* ¶ 278.

- In 2014, Nasser and Murdoch hosted then-Australian Prime Minister Tony Abbott in New York on behalf of the Association.[125]

- In 2015, Murdoch brought Nasser to a Hudson Institute gala to celebrate Murdoch receiving the Hudson Institute's Global Leadership Award, presented by Henry Kissinger.[126]

- In 2017, Nasser held a thirty-person event at the American Natural History Museum. An entire section of the program described "[t]he Murdoch Connection" and explained that Nasser and Murdoch are "close both commercially and personally."[127]

- In 2017, Murdoch hosted an Association event for newly elected President Trump on the U.S.S. Intrepid. Nasser planned to attend but ultimately could not.[128]

- In 2023, the Association honored Murdoch and Lachlan twice.[129]

- In 2023, Nasser facilitated the appointment of Abbott, one of Murdoch's close friends, as an "independent" member of the Board. Nasser knew about Murdoch's close friendship with Abbott. As Lead Independent Director, Nasser nevertheless led the Board in concluding that Abbott was "independent of the Company and its management."[130]

The complaint than continues with a recitation of longstanding business affiliations between Nasser and Murdoch:

---

[125] *Id.* ¶ 279.

[126] *Id.* ¶ 280.

[127] *Id.* ¶ 281.

[128] *Id.*

[129] *Id.* ¶ 282.

[130] *Id.* ¶ 283.

- Nasser has served on the boards of Murdoch-affiliated companies for twenty-one consecutive years, including at (i) BSkyB (2002–12), (ii) Twenty-First Century Fox (2013–19), and (iii) Fox (2019–23).[131]

- After Nasser suffered through a brief and unsuccessful tenure as CEO of Ford (1999–2001), Murdoch helped resuscitate Nasser's career by placing him on corporate boards.[132]

  - After Ford fired Nasser in 2001, Murdoch invited Nasser to join the board of BSkyB, a British pay-television company, as an independent director. Nasser had no relevant skills for the BSkyB directorship.[133]

  - During his ten-year tenure (2002–12) as a BSkyB director, Nasser regularly supported Murdoch, including advocating a stock buyback program in 2005 that increased News Corp's ownership stake. He also supported the contentious appointment of Murdoch's thirty-year old son James as CEO, then rallied behind the Murdochs during a phone-hacking scandal.[134]

Through these allegations, the complaint pleads a constellation of facts that goes beyond what was sufficient in *BGC*. The plaintiffs have not simply alleged that Nasser and Murdoch "move in the same social circles."[135] Nor have they "just assert[ed] that a close relationship exists."[136] The complaint pleads decades-long social, personal, and business relationships that provide a reason to doubt Nasser can independently evaluate claims against Murdoch.

---

[131] *Id.* ¶ 272.

[132] *Id.* ¶ 274.

[133] *Id.* ¶¶ 275–76.

[134] *Id.* ¶¶ 44, 276.

[135] *Beam II*, 845 A.2d at 1051.

[136] *Marchand*, 212 A.3d at 818 (alteration in original).

The defendants strive to defeat the inference of a lack of independence by attacking each allegation individually.[137] The court must view the allegations holistically.[138]

The defendants try to downplay Nasser and Murdoch's longstanding ties through the Association by citing *Zuckerberg* for the proposition that "there is no logical reason to think that a shared interest in philanthropy would undercut [a director's] independence."[139] Characterizing the Association as "philanthropy" is misleading. The Association unites a high-powered group of recent Australian immigrants who make it their business to support each other in developing ties between America and their homeland. Belonging to the Association suggests a shared sense of identity. The Association is not a garden-variety charity.

Again relying on *Zuckerberg*, the defendants argue a sense of gratitude "can only raise a reasonable doubt about [the director's] independence if remaining a [company] director was financially or personally material to [the director]."[140] This is another attempt to turn *homo sapiens* into *homo economicus* by positing that some

---

[137] *See, e.g.*, DOB at 46 (quoting *Owens v. Mayleben*, 2020 WL 748023, at *10 (Del. Ch. Feb. 13, 2020) ("[T]he fact that a founder invited a director to join the company's board of directors, *without more*, does not support an inference that the director cannot exercise independent judgment in matters involving the founder.") (emphasis added)).

[138] *See Sanchez*, 124 A.3d at 1023.

[139] 262 A.3d at 1062 (alteration in original); *see* DOB at 43–44.

[140] 262 A.3d at 1063 (alteration in original); *see* DOB at 46.

people are too rich to be grateful. In reality, "an array of other motivations exist that influence human behavior," including gratitude.[141]

The defendants also question Nasser's indebtedness to Murdoch by observing that he joined two other boards at the same time Murdoch installed him on the BSkyB board.[142] That argument asks for the defense-friendly inference that joining two other boards would make the BSkyB board less significant. At the pleading stage, the court cannot assume that.

Finally, the defendants argue that Nasser did not do Murdoch's bidding by determining that Abbot was independent because the Board's determination about Abbot's independence "was not made by Nasser alone, but by the full board."[143] True, and the plaintiffs do not argue otherwise.[144] The complaint quotes the Company's SEC filings, which state that Nasser, as Lead Independent Director, was responsible for "supervising the Board's determination of the independence of its Directors."[145]

---

[141] *Oracle*, 824 A.2d at 938.

[142] *See* DOB at 45 (citing *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 997 (Del. Ch. 2014) (holding the conclusory allegation that a director "owed [his] advancement and success" to another director, with no support from any factual allegation, is insufficient), *aff'd*, *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015)).

[143] *Id.* at 47.

[144] *See* Compl. ¶ 283 ("[Nasser] supervised the Board's affirmative determination that Abbott was 'independent of the Company and its management' . . . .").

[145] *Id.*

The plaintiffs are entitled to rely on the Company's disclosures and ask the court to draw reasonable inferences based on what they say.

The defendants also argue that the plaintiffs failed to plead that Abbott's appointment as an independent director violated Nasdaq rules. "This argument conflates a reasonable inference drawn from the pleaded facts with the pleaded facts themselves. The plaintiffs were not required to plead all inferences."[146] Based on the plaintiffs' allegations about the longstanding relationship between Abbott and Murdoch, it is reasonable to infer that Abbott's appointment was a sufficiently close call that Nasser had to push for the determination.[147]

Nasser is not independent for purposes of making a decision about asserting claims that threaten Murdoch with a substantial risk of liability. That disqualifies Nasser for purposes of the Rule 23.1 analysis.

### 4. Demand Is Futile For Count I

At least half of the Fox Board—Murdoch, Lachlan, Carey, and Nasser—cannot impartially consider the claims against Murdoch in Count I. Demand therefore is excused as to Count I.

---

[146] *Lebanon Cty. Emps.' Ret. Fund v. Collis*, 311 A.3d 773, 804–05 (Del. 2023).

[147] *See* NASDAQ Listing Rule 5605(a)(2) ("'Independent Director' means a person other than an executive officer or employee of the company or any other individual having a relationship which, in the opinion of the Company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.").

49

The claims in Count I against Lachlan, Scott, and Dinh survive under Rule 23.1 as well. When claims arise out of a common nucleus of operative facts, a reasonable doubt about a director's ability to assert one claim extends to the director's ability to assert another claim, because seeking to prove the former claim puts the director at risk for the latter claim.[148] Here, the claims against Scott and Dinh arise out of the same nucleus of operative facts as the claims that give rise to a substantial threat of liability against Murdoch (and Lachlan). Pursuing a claim against Lachlan, Scott, or Dinh would embroil the Company in proving the same facts that would give rise to liability for Murdoch. The Demand Board therefore cannot consider the claims against Lachlan, Scott, or Dinh either.

---

[148] *See Walton*, 2023 WL 3093500, at *29 ("If another set of claims arises out of a different nucleus of operative facts or concerns a different transaction, then the court moves on to the next claim and repeats the process."); *accord In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *47 (Del. Ch. Jan. 27, 2021) ("While it is true the demand futility analysis 'is conducted on a claim-by-claim basis,' where 'the factual allegations underlying [different Counts] are congruous,' demand is excused as to all of those counts under *Rales'* substantial likelihood of liability prong. In other words, where a member of the demand board's interest extends beyond derivative claims asserted against him to claims asserted against his co-defendants, he is deemed unfit to consider a demand to pursue those claims as well.") (cleaned up); *Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *26 (Del. Ch. Aug. 24, 2020) (holding demand futile as to Counts II and III where "[a]n investigation of the alleged officer breaches of duty would necessarily implicate the same set of facts as Count I"); *Hughes v. Hu*, 2020 WL 1987029, at *18 (Del. Ch. Apr. 27, 2020) (holding demand futile as to claims that involve the same underlying conduct); *see also Garfield v. Allen*, 277 A.3d 296, 361–62 (Del. Ch. 2022) ("The current case does not warrant additional pleading-stage pondering. The plaintiff has alleged facts that support a claim for breach of contract, claims for breach of fiduciary duty, and a claim for unjust enrichment. All of the claims arise from a common nucleus of operative fact, so a pleading-stage ruling is unlikely to simplify discovery or the presentation of the evidence at trial.").

**B.      Count II**

Count II asserts that Fox's outside directors—Carey, Ryan, Nasser, Dias, and Hernandez—breached their fiduciary duties. Pleading in the alternative, the complaint asserts that the outside directors "acquiesced to a business strategy of pursuing profit through actionable defamation," "disregarded red flags respecting defamation liability to Dominion and Smartmatic," or "failed to act in good faith to establish information and reporting systems that mitigate defamation risk."[149] The allegations supporting these theories arise out of the same nucleus of operative facts as the claims against Murdoch.

As noted previously, when another count of a complaint arises out of the same nucleus of operative facts as a claim for which demand is excused, a separate director-by-director demand futility analysis is unwarranted. That is because if the directors decided to sue on the second count, the claim would implicate the first count.

Count II implicates the same nucleus of operative facts as Count I. Murdoch faces a substantial risk of liability on Count I, and because of that fact, a majority of the Demand Board cannot make an independent and disinterested decision whether to assert Count I. The same Board cannot make an independent and disinterested decision about Count II, because if the Company asserted the claim delineated in Count II, the proceedings would also implicate Count I.

---

[149] Compl. ¶ 299.

The plaintiffs' grouping of claims may obscure this straightforward conclusion. Count I against the "Officer Defendants" alleges that Murdoch and Lachlan acted in bad faith as officers and directors. Count II alleges that the "Outside Director Defendants" acted in bad faith and violated each species of oversight duty. Because of that pleading choice, Murdoch and Lachlan do not face a substantial likelihood of liability under Count II. That may create the illusion they could consider a demand as to Count II independently and disinterestedly.

Conceptually realigning the claims makes the consequences clear. If the complaint asserted claims against Murdoch and Lachlan only as officers in Count I and then as directors in Count II, it would be readily apparent that the two primary defendants cannot make a disinterested and independent decision regarding Count II, because pursuing Count II would also implicate the claims in Count I. Carey and Nasser also cannot make a disinterested and independent decision regarding Count II, because they are not independent from Murdoch. The Demand Board thus lacks a disinterested and independent majority that can consider Count II.

## III.     CONCLUSION

The defendants' motion under Rule 23.1 is denied.